```
             IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MARYLAND
                     NORTHERN DIVISION

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA,         :
                                  :
     v.                           :   Criminal No. JKB10-4761
                                  :
ANTONIO MARTINEZ, a/k/a           :
MUHAMMAD HUSSAIN                   :
                                  :   Baltimore, Maryland
             Defendant.           :
- - - - - - - - - - - - - - - - - x   December 13, 2010
```

**HEARING**

```
BEFORE:             THE HONORABLE SUSAN K. GAUVEY, Judge


APPEARANCES:        CHRISTINE MANUELIAN, Esq.
                    Office of the United States Attorney
                    36 S Charles St Fourth FL
                    Baltimore, MD 21201
                        On Behalf of the Government

                    JOSEPH BALTER, Esq.
                    Office of the Federal Public Defender
                    100 South Charles Street, 9th Fl.
                    Baltimore, MD 21201
                        On Behalf of the Defendant


Audio Operator:     Howard Goldsmith

Transcription Company:  CompuScribe
                        5100 Forbes Boulevard
                        Suite 102
                        Lanham, MD. 20706
                        (301) 577-5882
```

Proceedings recorded by electric sound recording, transcript produced by transcription service.

I N D E X

                                                          Page
Preliminary Discussions                                    3

Comments by Joseph Balter, Esq.
      Attorney for the Defendant                           3

Comments by Christine Manuelian, Esq.
      Attorney for the Government                          9

Comments by Joseph Balter, Esq.                           21

Comments by Christine Manuelian, Esq.                     28

Detention Ruling by Judge Gauvey                          34

Keynote:  "---" indicates inaudible in transcript.
          "*" indicates phonetic spelling in transcript.

1                        P R O C E E D I N G S

2              MR. BALTER:  We are going forward with the hearing.

3              THE COURT:  All right.  Ms. Manuelian?

4              MS. MANUELIAN:  Yes, Your Honor.  The Government is

5    going to proceed by proffer. I understand that the --

6              MR. BALTER:  Excuse me, Your Honor, if I could just

7    expedite matters in case the Court is going to viewing this

8    matter in a different way.  There has -- I have requested of

9    the Government that they provide or have present in the

10   courtroom the case agent in this case, Agent Bender.  Who is --

11   not the case agent but the --- to the support for the complaint

12   in front of the Court.

13             And I have advised the Government as well that I

14   intended to request of the Court that the Court make a ruling

15   that the Government proceed by testimony rather than by

16   proffer.  And just briefly, to explain my reasons for that,

17   Your Honor, I think it is well established within the district

18   that the Court does have the discretion to require the

19   Government to proceed by proffer in the event that there is

20   specific factual issues that would make it incumbent upon the

21   Government to provide the type of more detailed testimony

22   subject to cross examination that may  not be provided in the

23   affidavit.

24             And from my understanding of this case and the

25   review mainly just of the affidavit, I think this is clearly

1  one of those types of situations.  What we have here is the

2  Government's sting operation.  There can be no question other

3  than the fact that the Government induced the defendant, Mr.

4  Martinez as I would have the Court note, he prefers to be

5  referred to as Muhammad Hussain but they induced him to be

6  involved in an act which was clearly the design of the

7  Government.

8         The Government put into effect a series of events

9  which lead to this fake bombing of the Army Recruitment Center.

10  The way in which this whole matter began has to do -- was

11  apparently contacts between Mr. Hussain and an undercover

12  informant.  The undercover informant supposedly after viewing I

13  believe, it was two Facebook postings, went to the Government

14  and indicated some level of concern or some level of -- for

15  some reason felt it was incumbent upon him to let the

16  Government know about information contained on the postings.

17         Following that the -- he -- apparently the

18  Government sent Mr. -- sent the informant back to have further

19  meetings with Mr. Hussain, several meetings that apparently

20  were not reported, unlike these subsequent meetings and it was

21  only after that, that a more concerted effort to follow through

22  on this -- on this investigation which lead to this ruse of a

23  fake bombing.

24         Now I think, Your Honor, that the Court must be in

25  considering the weight to be given to the Government's evidence

 1   must consider very carefully what occurred at the initial

 2   stages of this investigation.  First of all, I think it is very

 3   significant the fact that this affidavit unlike most

 4   affidavits, makes no allegations whatsoever with regard to the

 5   background or the reliability of the informant.

 6          That in every case in which there is Government

 7   inducement, in which there is Government activity related to

 8   the criminal activity itself is essential to knowing -- there

 9   being nothing in this affidavit with regard to that, I think it

10   is essential that the defense -- that there be a more -- that

11   there be testimony that would make it clear exactly what the

12   background and the incentives and the benefits that went to

13   this informant would have been.

14          The second part, Your Honor, is that the critical

15   communications in this case appear to be in regard to the

16   initial discussions between the informant and Mr. Hussain which

17   in which there was supposedly the question as an attack on a

18   military recruitment center was broached for the first time.

19   And as I indicated, there are apparently three early

20   conversations, following the initial report by the informant to

21   the Government that were not recorded and it is the context, it

22   is the specifics, it is very fact that went into these

23   particular communications which is we believe, the most

24   critical matter for this Court to be considering.

25          And without --

1          THE COURT:  Let me have you stop a minute, Mr.

2   Balter because I am obviously not as familiar as you are with

3   this case. I am looking at page 3 of the complaint and the

4   complaint is not sealed and in paragraph 8, they talk about

5   October 22nd, that as they call him "Mr. Martinez approached

6   the CHS about attacking an Army Recruiting Center."

7          You are saying prior to that time, there had been

8   these unrecorded conversations?

9          MR. BALTER:  No my -- my inference, if you look at

10  page 4, paragraph 9, Your Honor.  On October 29, the informant

11  engaged in the first of many recorded conversations.  I infer

12  from that, that the conversations that proceeded the 29th were

13  unrecorded.  So that would mean that they were unrecorded, if

14  you look at page 3 again, there were unreported conversations

15  on October 22nd and that again, if you just quick review of

16  that shows that there was supposedly the first statements with

17  regards -- first conversations about attacking the recruitment

18  center.

19          THE COURT:  Right.

20          MR. BALTER:  Then subsequent to that, on October 25,

21  there was a -- it says, "A brief unrecorded meeting at a gas

22  station" in which there was more discussion about attacking the

23  military installations and finally on October 28, there was

24  another unrecorded conversation.  Now if you look again, Your

25  Honor, at paragraph 5 and 6 -- starting with paragraph 5 on

1   page 3, what the informant is bringing to the Government was

2   two postings on the internet, on the Facebook on September 29th

3   and October 1st.

4          In which there is obviously nothing specific with

5   regard to any type of plans for attack, I would submit that

6   that is protected First Amendment speech, which is making no

7   threat against anybody.  It is -- it has a political and a

8   religious content to it, but certainly there is nothing which

9   would -- we would lead one to believe that there is any kind of

10  impending attack on anything.

11         And it is from that supposedly that the informant

12  goes to the authorities, and thereafter is apparently

13  dispatched to continue to engage in conversations with

14  Mr. Hussain.  That certainly begs much further inquiry as to

15  what the nature of that pre-existing relationship is between

16  the informant issues with regard to the reliability of the

17  informant and thereafter what the circumstances of these

18  conversations with -- the three conversations on the 22nd, the

19  25th and the 28th.

20         THE COURT:  Yes, I understand your point, Mr. Balter

21  is there was no recorded conversation -- unrecorded

22  conversations that dealt with these kinds of actions.  And

23  there was the first recorded conversations when the first

24  specific conduct is really discussed.  And so I appreciate that

25  something that you and your office are going to look at very

1   carefully but to me it doesn't undermine the rest of the

2   affidavit in terms of the continued actions.

3           I certainly understand your argument but I don't

4   think it requires the presence of the CHS to be here.

5           MR. BALTER:  Well, first of all, Your Honor, I

6   didn't ask for the presence of the informant at this point. I

7   frankly think that that is the way that we should proceed.  All

8   I ask for is the presence of the offiant.  And the reason why I

9   think that this is essential for the Court's assessment of the

10  issue of the strength of the Government's case is that they are

11  clearly on the face of this -- of these charges is a very

12  legitimate issue with regard to whether or not the Government

13  entrapped Mr. Hussain.

14          THE COURT:  And I appreciate that that is an air of

15  defense that is going to be vigorously prosecuted and

16  investigated by your office. I don't think at this point that

17  it is necessary to have the offiant here.  For that period of

18  time, the lead up to the first recorded conversations and your

19  argument -- your developing argument about entrapment.

20          So I understand the critical nature of that time

21  period but at this point, I don't think it requires me to have

22  that offiant here in person.

23          MR. BALTER:  Thank you, Your Honor.

24          THE COURT:  Yes?

25          MS. MANUELIAN:  Your Honor, obviously the Court has

1    had the opportunity I understand to see and read the complaint.

2               THE COURT:  Yes.

3               MS. MANUELIAN:  And I just want to add some

4    information to that.  Specifically with respect to what

5    actually occurred on the day that the attempt was made.  And I

6    do want to make one correction to something that Mr. Balter

7    pointed out. I think it is critical that the Court remember as

8    outlined on page 3 of the criminal complaint that there were --

9    in addition to the public postings on September 29, in which

10   Mr. -- in which the defendant is talking about essentially the

11   reign of oppression ceasing and laying out a threat with

12   respect to that and talking about how he hates those who oppose

13   Allah.

14               The other two communications that we have are

15   specific statements that he made on October 10 and October 14

16   to the CHS in a Facebook conversation, which we have the

17   transcripts of those, especially the one on October 14, where

18   he talks about his dream to be among the ranks of the --- to be

19   a warrior and that he hoped that Allah would open a door for

20   him because all he thinks about is Jihad.

21               These statements leading up to the initial

22   conversation on October 22, obviously are very supportive of

23   what he then goes forward to say to the confidential informant

24   on the 22nd about identifying a particular target, that being

25   the military and then what he elaborates on to a great extent

1  throughout all of the recorded conversations that the Court can

2  see in the remainder of the complaint affidavit. Not only to

3  the confidential informant but also to the undercover agent in

4  this case.

5        So what I want to do first is to just highlight a

6  little bit more with some more specificity, some of the events

7  that occurred that are recorded and on video tape on December 8

8  when the defendant attempted to detonate this bomb.  He

9  initially  met as I think we say in the affidavit or said in

10 the affidavit, in a public parking lot where he was going to

11 meet with both the confidential source and the undercover

12 agent.

13       Prior to the undercover agent arriving, we have the

14 defendant on tape talking to the CHS and giving him

15 instructions about what to do if in fact the defendant gets

16 caught.  And basically said, "If a cop tries to stop me I will

17 keep driving and you see that there is no way out, go ahead and

18 press the button."  Meaning, make the phone call or phone calls

19 that were ultimately going to detonate the bomb.

20       Basically telling the CHS that there is no way out,

21 I want you to do what I was going to do.  He said, "I will try

22 to run but I have been around and I know that cops will keep

23 chasing me, so if I stop and run, go ahead and press the

24 button."  That is part of the recorded conversation leading up

25 to when the undercover agent actually arrives at the public

1   parking lot to provide the keys to the SUV that contained the

2   vehicle bomb.

3          The defendant also during this lead into what

4   occurred that day told the CHS, "Did you read your Facebook

5   account?  I left a message for you. I didn't know how you were

6   feeling" because prior to this, the CHS had expressed some

7   reservations about whether this was something that the -- not

8   only the defendant wanted to do but whether this was something

9   that he wanted to join the defendant with.

10         During one of those conversations, it was the

11  defendant and I think it is cited in the complaint who said,

12  Hey I brought you into this or I came to you about this

13  brother.  Meaning, it was the defendant who actually brought

14  the informant --

15         THE COURT:  Where is that specifically?

16         MS. MANUELIAN:  In the complaint, Your Honor, I

17  believe that that is -- if you could just give me a moment.

18         (Pause.)

19         MS. MANUELIAN:  Here it is, on page 16, paragraph

20  35.  It was a conversation on December 4 and the informant was

21  asking the defendant how he was feeling about all of this.

22         THE COURT:  I see it now, thank you.  Thank you.

23         MS. MANUELIAN:  Anyway, the message and I have a

24  copy of this that I will provide also to Mr. Balter.  The

25  message that was sent to the confidential informant's Facebook

1   account by the defendant was essentially the following.  "In

2   the name of Allah" it was sent on December 7, at 6:11 p.m.

3              (Whereupon, portions of the message were read into

4   the record.)

5          "In the name of Allah, most gracious, most merciful,

6          praise be to him and may he send peace and blessings

7          to our beloved prophet, Muhammad who is Sahaba* and

8          family.  Al humdudillah*, my beloved brother

9          Allatahla* has chosen us for implementation of his

10         deed and I am proud of sharing this time with you

11         because this is a lifelong journey.  A journey that

12         will require patience, sincerity, unity and most

13         importantly the reliance on Allah.  Oh my beloved

14         brother, I love you for the sake of Allah, you are

15         of me and I am of you and with the help of Allah, we

16         will be victorious in ---, may he accept us Amein."

17             (Whereupon, the reading of the message ended.)

18             MS. MANUELIAN:  Obviously, reflecting the mind set

19   that he was --

20             THE COURT:  What was the word after victorious?

21   Will be victorious?

22             MS. MANUELIAN:  Ishalla --

23             THE COURT:  Ishalla, God willing.

24             MS. MANUELIAN:  May he accept us, Amein.  That was

25   the Facebook message that he was referring to when he met the

1   informant on December 8.  He also specifically mentioned that

2   the UC should be the one to go on into the recruitment center,

3   so while he was parking the SUV, so he could know for certain

4   who was in there.  There had been some discussion about that

5   being done, when he confirmed to the CHS at the time they were

6   having this conversation, that that is the way it really should

7   go.

8          And he said, "I just want it to go smooth."  The UC

9   arrived on the scene, exchanged -- they went through the

10  instructions again about exactly how the bomb should be

11  detonated.  And then he gave the keys to the SUV to the

12  defendant.  At that point in time, the undercover agent went to

13  his vehicle.  The CHS was remaining in his vehicle and on

14  camera we see and on video tapes, all of which obviously will

15  be provided at a later date to Mr. Balter in discovery.

16         We see the defendant go to the back of the SUV, open

17  it up.  Actually arm the device which he had to hook up some

18  wires and he also had to trip the switch to actually arm the

19  device which was a large -- a vehicle bomb that had been

20  assembled in the back and he is seen doing that on tape.

21         And then you can see him from another camera angle

22  go into the vehicle, get behind the wheel grinning from ear to

23  ear to get ready to drive off and he gives a sign to the CHS

24  and to the undercover in their vehicle and basically says ---

25  which is praise God and off he goes to drive to the recruiting

1  center with the SUV.

2          He is then observed on video by surveillance agents

3  circling the building a number of times to determine -- and we

4  found out later when he gave a statement to the police or to

5  the law enforcement agents that he was circling the building a

6  number of times to determine whether or not there were police

7  in the area.

8          He then parked the vehicle with the bomb in front of

9  the recruitment center right in front of the building, got into

10 the vehicle being driven by the informant and they went off to

11 a pre-determined area where they were going to have the ability

12 to see what was happening and there they waited for a call from

13 the undercover agent saying that -- confirming that there were

14 in fact soldiers in the building.

15         And I think that there was some -- you can --

16 something with respect to the number of individuals that were

17 there, it was either 6 or 7.  You can see the defendant on the

18 video tape get the call from the UC and then he has the

19 detonation cell phone in his hand and you see him making the --

20 looking at a piece of paper with a phone number and making the

21 call.

22         He had to  make the first call according to what

23 everybody agreed, it was essentially to trip the -- it was an

24 additional call for safety and then, it was a call -- the

25 second call was to actually detonate the device.  And he makes

1    a number of calls and then realizes that nothing has happened,

2    at which point he is telling the confidential informant, we

3    need to get out of here, because at that point he obviously

4    realized that something was amiss and that was when he was

5    placed under arrest.

6           While the defendant was waiting -- and the CHS were

7    waiting in the public parking lot before meeting with the UC,

8    the defendant  have the CHS film him on a camcorder that they

9    were going to use to film the bombing and he started making a

10   statement on that to the camera basically saying, "We are one

11   of those who wage war with Islam.  We are not criminals.  We

12   are Mujahideen, until you stop waging war against the dean of

13   Allah, we will always continue to fight against you. There will

14   be no peace for the oppressors, you will feel our bullets."

15          Your Honor, after the defendant was arrested,

16   shortly within an hour or so after his arrest when he came back

17   to be processed at the FBI, prior to coming to Court, he

18   provided a statement which I will give -- I have a copy of that

19   for Mr. Balter, we were able to complete -- the agents were

20   able to complete a 302 with respect to that.

21          In that statement, Your Honor, he was advised of his

22   rights.  He was very calm and essentially went on to admit to

23   all of the things that he had done.  He said he was aware of

24   the explosives that were in the back of the SUV.  He described

25   them in detail and obviously we have him on videotape

 1  inspecting those explosives as well as arming the device.  He

 2  talked about the fact that he parked the SUV in front of the

 3  building because he believed that that is where the soldiers

 4  were and he thought that the explosion would -- parking the car

 5  there would give the maximum benefit to the nature of the

 6  explosions and actually killing the soldiers inside.

 7          He acknowledged that he was driving around the

 8  center and he said he did that because he was looking for

 9  police.  He said he went through with the attack because he was

10  doing it for the right cause.  He admitted activating the

11  device. He said it was his idea all along from as far back as 2

12  to 3 months before he even met the confidential informant to

13  attack this particular recruiting station.

14          He said, "The attack was not about making a

15  statement, it was about making an effort to fight in the cause

16  of Allah."  He said that nobody had influenced him about Jihad

17  or suggested that that was -- that that affected him in

18  deciding that that was something that he wanted to do. He said

19  he had been listening to many online scholars including Anwar

20  Allalocki* which we have mentioned in the affidavit.

21          He said that those scholars were talking about the

22  duty to wage Jihad, which he defined as a Holy War, essentially

23  he said he wanted to be a Mujahideen, which in his mind was a

24  holy warrior.  He said that local Imams, here in Baltimore had

25  tried to talk him out of Jihad, that they said this was the

1   time for peace and for Dahla which is the word for

2   proselytization.  But he came to his own mind and in his own

3   mind that this was the appropriate thing to do.  He was

4   passionate about an armed struggle in the path of Allah which

5   is how he defined what Jihad was.

6           He said he was always suspicious that this might

7   have been a set up with respect to the ultimate, what happened

8   with the undercover officer but when he got into the SUV and he

9   smelled the fumes, he thought, you know, maybe this is in fact

10  real.  And he very matter of factly told the agents who

11  interviewed him, "I always figured there were two possible

12  outcomes. Either I was going to get locked up or I was going to

13  succeed."

14          And he said that "It would be easy for him to have

15  gone to a Wal-Mart and to have gotten a gun but he decided that

16  this was the way to proceed."  And he admitted to -- all of the

17  events leading up to that day on December 8, as well as what

18  happened that day.  Your Honor, we also were able to obtain and

19  I think I do have a copy here for Mr. Balter, again these are

20  material that are subsequently going to be turned over in

21  discovery but sicne I am referring to it today, I wanted to be

22  sure that Mr. Balter had a copy.

23          We were able to retrieve -- the agents were able to

24  retrieve a notebook that was contained amongst a number of

25  personal articles that Mr. Martinez, the defendant had been

1   keeping at his father in law's residence.  These were obtained

2   via consent.  In the notebook and I copied all the pages that

3   we were able to get, the first article is dated spring May 5,

4   2009.

5            And in this -- what appears to be Mr. Martinez,

6   writings -- various writings, he talks about what it really

7   means to be a Samurai and how it is respectable to swear

8   loyalty to your sword and master and give your life to defend

9   his honor.  It is the Samurai way. The ability to live through

10  death is also part of the way.

11           He talks about a great Samurai warrior, who's name

12  remains -- known all around the world from the islands of Japan

13  to the streets of America.  "Even though the warrior is gone,

14  his spirit lives on through the sword. Oh, how I wish for the

15  same fate.  To be remembered forever as a fearless warrior

16  whose name lives on for centuries.  A warrior's death is what I

17  am in pursuit of and a warrior's life I want to live.  But I

18  have much to learn of this road but I am willing to endure a

19  warrior's life."

20           There are a couple of other statements. There are

21  many biblical quotes.  He talks about mastering your weapons

22  and comprehending the advantages of weapons.  And on one

23  particular page, he talks about insurgent tactics, it is

24  misspelled.  And it has  here "IEDs could be in dead animals,

25  cardboard box that won't blow in wind.  Barrel on a funny angle

1   and abandoned cars parked in odd areas.  Where" -- it says

2   "Were"  , it appears to be misspelled.  "Were no uniforms,

3   operate from home, no type of communication that can be tracked

4   and no rank structure."

5          So this is an individual, Your Honor, who back in

6   way before ever having met or talked to the confidential source

7   about Jihad and being a warrior, had already had thoughts about

8   doing violent acts.  And if you look at the video tapes of him

9   on camera, arming this device, it is like doing an everyday

10  task like making a meal, going to work, there is no indication

11  of any remorse, concern, any nervousness that he is about to go

12  and kill people with an incredibly powerful -- what he believes

13  to be, an incredibly powerful vehicle bomb.

14         Under these circumstances, Your Honor, I don't think

15  that there is an combination of conditions that can ensure that

16  the -- first of all and foremost -- the danger, the protection

17  of the community and the flight risk that is involved here

18  given that the defendant is looking at a 20 year maximum

19  penalty for the attempted murder and a life penalty for use of

20  a -- attempted use of weapon of mass destruction.

21         His guideline level, Your Honor, is probably going

22  to be at 360 to life.  He is looking at a very, very long

23  sentence.  This is a case that under the Bail Reform Act, that

24  is entitled to the presumption and it is incumbent upon the

25  defense to be able to rebut that presumption, Your Honor. I

 1   don't think, given the lack of ties to the community, they are

 2   very tenuous ties, the defendant has no real residence.  He has

 3   been for the last three weeks or so he has been staying on and

 4   off with his mother.

 5        He has a very strained relationship with her and

 6   that is actually very clear in some of the recorded

 7   conversations where he talks to the CHS about the fact that his

 8   mother did not approve of his activities and didn't really know

 9   a lot of what was going on and the same can be said about his

10   father in law, which whom he was also staying on and off but

11   also with whom he has not provided information -- specific

12   information to him about the activities that were taking place

13   and who he was actually associating with and what his plans

14   were.

15        As far as his jobs are concerned, Your Honor, he has

16   worked on and off at a couple of places.  The last employment

17   that he told the CHS was that he was working under the table

18   for some construction -- doing some construction and odds and

19   ends.  But he also made it very clear to both the CHS and the

20   undercover in a recorded conversation which I think is also

21   referenced in the complaint.  That he wasn't holding regular

22   jobs because he felt the tax revenues were going to pay for the

23   military and he believed that the military was at war --

24   America and the military were at war with Islam and that was

25   why they were legitimate targets for his violent acts.

1          Under all of these circumstances, Your Honor, the

2     Government requests that the defendant be detained pending

3     trial.

4          THE COURT:  All right.  Thank you very much.  Yes,

5     Mr. Balter, I know you appreciate and given the seriousness of

6     the charge and the considerable evidence that has been

7     collected, not withstanding your arguments about entrapment,

8     that it is a difficult burden for you.

9          MR. BALTER:  Your Honor, we certainly understand

10    that and we understand  the concern that the community has

11    about these type of acts.  We are also mindful of the fact that

12    the circumstances in which this investigation took place, pose

13    very very serious questions about what the Government's role

14    was in provoking action which under other circumstances

15    certainly would have been very, very serious but which in this

16    particular case were purely the design of the Government.

17          If you go through this entire complaint, you will

18    see other than the chatter about the use of the -- there is

19    chatter about firearms, there was chatter about the use of

20    possible bombs.  There was chatter about something called

21    "bottled cocktails --- type of devices" there was chatter about

22    at least three individuals supposedly that Mr. Hussain would be

23    reaching out to to try to enlist other individuals to be able

24    to participate in a plan.

25          There was chatter about the fact that there was

1   money to be gathered to carry out this plan.  There was

2   nothing, there was nothing produced which showed that Mr.

3   Hussain had any ability whatsoever to carry out any plan.  All

4   of this was -- all of this activity was the purely the creation

5   of the Government.

6          And we submit it was a creation that was implanted

7   in Mr. Hussain's mind. Now I understand the Court takes the

8   position that there is a lot of evidence here of his

9   participation in the final acts, which Ms. Manuelian went to

10  great lengths to describe about what happened on December 8th.

11  But I think that the Court must be conscious of the fact that

12  in essence, despite the Government's close investigation of

13  this and control over every aspect of, there were many recorded

14  conversations after the initial information was apparently

15  gathered by the informant, there were a series of recorded

16  conversations.

17         Quite conspicuously the Government chose not to

18  record the most important conversations.  It was clear that the

19  informant had come to the Government with evidence of the

20  Facebook listings at the initial part of this investigation and

21  I submit that there was nothing specific, nothing that would

22  justify the Government in taking any specific action with

23  regard to any criminal wrongdoing in those two initial Facebook

24  postings.

25         And I would submit that the rest of the postings are

1   vague at best themselves.  But after knowing that there was at

2   least concern by the informant, they apparently enlisted the

3   informant to go out, have further conversations with Mr.

4   Hussain in which quite frankly the most important information

5   in this case was supposedly gathered, which one can only infer

6   the Government made the intentional decision that they would

7   not be recorded.

8          And one can only infer what that does as we see in

9   this affidavit, as it allows quite frankly the Government to

10  totally control the narrative.  Everything we know about what

11  happened in those conversations is distilled through the view

12  of the Government which is clearly not a disinterested party in

13  this entire investigation.

14         Similarly with regard to the statements that were

15  made by Mr. Hussein, --- again, while I -- while the Government

16  did give me a brief synopsis of some of the statements which

17  were allegedly made, I have given a FBI 302, a five pages of

18  which I have not had the opportunity to review, but I do know

19  what I believe is the most significant factor is once again,

20  the Government shows not to apparently  make a verbatim

21  recording.

22         What we have here is a narrative, controlled

23  exclusively by the FBI as to what was said by Mr. Hussain.

24  Clearly the FBI has access to recording equipment that they

25  used in the course of this very investigation.  But once again,

1   among the most important statements, statements by Mr. Hussain,

2   supposedly about the way in which what his whole history of

3   activity was which was not recorded and which apparently the

4   only record we will ever have is the recollections of the

5   individual FBI agents.

6          And I submit, Your Honor, it is not dispositive, I

7   understand that.  But in terms of this Court's determination as

8   to whether or not Mr. Hussain is a threat at this particular

9   time, the Government has to take into account the weight of the

10  Government's evidence, the Court has to take into account the

11  way in which this investigation was taken.  The clear -- there

12  could be no dispute about the fact that Mr. Hussain himself was

13  incapable of conducting any part of this part.

14         He didn't obtain any firearms, he has no indication

15  that he ever possessed a weapon. There is no indication that he

16  has ever collected any  money.  Every person he sought out to

17  help simply blew him off immediately.  In fact, if we were to

18  believe what happened here, when they were getting ready for

19  the events of December 8, he didn't even know how to drive a

20  car.

21         They had to practice in a parking lot, him driving a

22  car so that the FBI plan of him driving a car from one point to

23  another to locate this -- near this installation could take

24  place.  This is a cookie cutter arrangement that the FBI uses.

25  If you review the reports out of the Portland case, which is

1  similar to this, what they do is they design a plan in which

2  they put a bomb, a fake bomb into a vehicle. They tell the

3  individual who --

4       MS. MANUELIAN:  Your Honor, I am sorry, I have to

5  object to Mr. Balter going on about what happened in the

6  Portland case of which I don't know the details myself and and

7  the relevance of what that has to do with the rebuttable

8  presumption.  So I would object.

9       THE COURT:  I am allowing both of you to give me

10  probably more information than is required at this point.  I

11  understand why you are saying he is trying to undermine the

12  validity of the credibility that this man was doing, rather it

13  was the Government that has this cookie cutter approach to try

14  to entrap people or try to attract people. I understood that

15  and I do appreciate it and I am overruling your objection.

16  What else do you want -- and I understand that, Mr. Balter.

17       MR. BALTER:  That is exactly my point, Your Honor.

18  And if in fact -- if in fact, there was that inducement made by

19  the Government that it is clear that the issue -- that every

20  point along the way of this case is what the pre-disposition

21  was.  And that is why I am so vehement in my opposition to what

22  the Government has brought forward here, is they have deprived

23  this defendant of the most compelling evidence as to whether he

24  did or did not have a pre-disposition at the beginning of his

25  case where there were 3 unrecorded conversations after the

 1   informant clearly was working for the Government and at the end

 2   of their investigation, after the arrest is made, there is a

 3   post arrest interrogation and again, a conscious effort to

 4   avoid making a verbatim record as to what it was that

 5   Mr. Hussain was about to say about his involvement.

 6          And for all those reasons, Your Honor, I think that

 7   this Court must look at this very carefully and should come to

 8   the conclusion that the Government in the first instances of

 9   establishing by clear and convincing evidence that this

10   defendant is a danger.  That has not been done.  So we don't

11   even get to the whether or not the presumption is rebutted.

12   They haven't done that by clear and convincing evidence in the

13   first instance.  Nor have they made out a flight threat.  For

14   those reasons, I think that this Court should be devising

15   conditions of release.

16          THE COURT:  Okay, so let me just make sure I

17   understand.  I am looking on page 3 again of the affidavit.

18   And we have the October 22 conversation which was the first --

19   no October 29 is the first conversation which was recorded and

20   you say there was the October 22 and then it --

21          MR. BALTER:  25 and 28.

22          THE COURT:  25 and 28.

23          MR. BALTER:  Those are both at the top of page 4.

24          THE COURT:  You are not counting the -- Facebook

25   conversation -- communications?

1           MR. BALTER:  Well, Your Honor, again I don't know

2   what one incurs from the Facebook conversations.  There

3   apparently were communications that were made, but again these

4   were the highly generalized nature.  And the Government makes

5   a tremendous amount and apparently understands -- pretends to

6   understand much of what these -- many of these Arabic terms

7   means, but with regard to any conversations with -- about

8   specific planning, that again -- again that started supposedly

9   on October 22nd.

10          That is when it says, "The CHS" -- it says "Martinez

11  approached the CHS about attacking the Army Recruiting Centers

12  or doing anything militarily."  Now that again is unrecorded.

13  There is no way for the defense to be able to gleen from this

14  whether or not there was coercion involved in those statements.

15  Whether or not there were any type of promises, any type of --

16  whether or not there was any type of conjoling.

17          Further, we don't know what the motive of the

18  informant was.  We don't know if this informant was working off

19  charges, we don't know if this informant had a serious felony

20  record.  We don't know if this informant had immigration

21  problems.  We don't know enough about the circumstances to know

22  how desperate that informant might have been to turn this

23  investigation into something that it simply was not.

24          We are dealing with a young man here, a 21 year old

25  man who may have had strong beliefs, who may have had strong

 1  passions about his religion, may have looked at things in a way

 2  that the rest of us might not.  But to the extent that there

 3  was a Government informant who was not only taking advantage of

 4  his susceptibility but using his position to exert influence

 5  and turn this into something it originally was not and to take

 6  a person who did not have a pre-disposition to commit these

 7  acts into something other than that is very serious.

 8           And the Government has conducted this investigation

 9  in such a way that we don't know.

10           MS. MANUELIAN:  Your Honor, if I may.  We do know.

11  And we do know from the myriad of recordings that were made in

12  which the defendant is not saying, "You are talking me into

13  this, I don't want to do it." He is telling the informant, this

14  is what I want to do, this is how we should instill fear and

15  this is why military are the appropriate targets.  They need to

16  know that if you join the military, you will be killed.  One

17  has to fight against those who fight against you.

18           And that is the first recorded conversation in which

19  he is going on and on of his own accord to the CHS talking

20  about the things he wants to do and he is the one who actually

21  makes the first reference to a car bomb, and I think we have

22  shown that quote on page 5.  Where Martinez said, "He thought

23  they could use a propane tank for the operation but they would

24  have to learn how to rig it."  And then he goes on to say,

25  "Like I wish I knew how to make a car bomb."

 1          This is somebody actually thinking through the

 2   various ways in which he can carry out this attack.  Either by

 3   getting a gun and shooting people in the face or blowing up

 4   cars or even later he talks about the fact that he knows how to

 5   make cocktail bombs or homemade bombs that can be used that

 6   they could throw into the building to disorient people and then

 7   shoot everybody as they are coming out.

 8          Mr. Balter is trying to focus on the few instances

 9   at the beginning where we have some unreported contacts to try

10   and ignore the incredible weight of the evidence of all of the

11   defendant's own personal statements in which he is going on

12   about the fact that this is what he wants and this is how he

13   wants to go about doing it, Your Honor.

14          So, Your Honor, at this point in time, the defense

15   has not rebutted the presumption that the defendant was a

16   danger to the community.  And the Court cannot ignore, also, I

17   think all of the Facebook postings that we put on page 10, in

18   which in between the various meetings that are occurring, the

19   defendant is talking about praising Anwar Allalocki, saying he

20   doesn't care if he is a terrorist, talking about the fight in

21   the name of Allah.

22          And posting videos of Mujahideen attacking western

23   coalition forces and showing his support for those. That one

24   occurred on the 7th. Those are clear indications -- indicators

25   of the defendant's mind set, Your Honor.  So the Court has to

1   look at the entirety of the evidence and the overwhelming

2   weight of it is not the couple of conversations that occurred

3   early on in this case, it is what happened afterwards when the

4   defendant came up with the idea and the means to do it and

5   pursued it ultimately with the undercover agent and then

6   engaged in the acts, despite the fact that he was given

7   repeated opportunities every single meeting with the undercover

8   to back out and he chose not to.

9            THE COURT:  Yes?

10           MR. BALTER:  Your Honor, I just think it is very

11   interesting that the Government hasn't taken the opportunity in

12   any way to vouch for the informant.

13           THE COURT:  Could I have counsel come up to the

14   bench for a minute, please.

15           (Whereupon, a bench conference follows.)

16           THE COURT:  I just have two things. One it is

17   unusual not to have some information about the informant.  And

18   that is something that I would be interesting to see.  And

19   secondly, the issue of the -- I wanted to make sure that I

20   understood correctly, that the confession statements were not

21   recorded --

22           MS. MANUELIAN:  They were not recorded.

23           THE COURT:  Neither audio or video?

24           MS. MANUELIAN:  Correct.  Standard FBI practice,

25   Your Honor.

 1          THE COURT:  That is not standard of other law

 2  enforcement.

 3          MS. MANUELIAN:  It depends on and off.  FBI has

 4  never recorded -- usually doesn't record statements. I wasn't

 5  aware actually that a statement was taken until after the --

 6  after I came here to Court so.

 7          THE COURT:  Okay but --

 8          MS. MANUELIAN:  But Your Honor, I think --

 9          MR. BALTER:  Your Honor, the Government --

10  Ms. Manuelian did contact me, she let me know that a statement

11  had been taken and that a 302 was being made.  So I have no

12  complaint about Ms. Manuelian about her way that that was

13  handled. I wanted to be clear --

14          THE COURT:  No it is an interesting way to put it in

15  terms of controlling the narrative.  And I appreciate that

16  argument but it is unlikely that I am going to be the one that

17  is going to be making any decisions based on that.  So -- all

18  right, I just wanted to give you a heads up on that.

19          MS. MANUELIAN:  Okay, did you want me to put that on

20  the record?

21          THE COURT:  I do indeed, thank you.

22          (Whereupon, the bench conference ends.)

23          THE COURT:  Thank you very much counsel.  At the

24  bench, I indicated I wanted to give you a heads up on some

25  information I am interested in.  And Ms. Manuelian, I do find

1    it unusual ordinarily and I was not the judge to decide this

2    criminal complaint, another judge did.  And we often see --

3    most frequently see some vouching for or reliability of an

4    informant.  So can you give me some of that information about

5    this information.

6              MS. MANUELIAN:  Certainly, Your Honor.  I think one

7    of the reasons that that was not put in there was because of

8    the fact that we have so many recorded conversations with the

9    defendant.  However, I can tell the Court that the confidential

10   informant in this case has not received any funds. He has no

11   criminal record.  He has only been recouped for some incidental

12   expenses, specifically the fact that the cell phone as noted in

13   the complaint, the cell phone was purchased for the defendant

14   in this case.

15              That was one of the expenses that he received

16   compensation for.  Other than that, he has not received the

17   money for this.  He is a person who came forward because of

18   concern about individuals in the community operating in the way

19   that this defendant has and he has not received any

20   compensation for this particular case.

21              THE COURT:  And he is not a recorded or registered

22   informant of any kind?

23              MS. MANUELIAN:  He is with -- has worked with the

24   FBI, Your Honor, for a very limited period of time prior to

25   this case in a couple of other minor matters providing some

1  other information.

2          THE COURT:  Okay.

3          MS. MANUELIAN:  For which he received very minimal

4  compensation.  And again, some reimbursement for expenses but

5  for this particular case, he has not received any compensation

6  and has not been paid in connection with the activities that he

7  undertook here, except for expenses that were incurred.

8          THE COURT:  Okay.  All right.  Thank you very much.

9  Anything further counsel?

10          MR. BALTER:  Your Honor, again, I believe that this

11  proffer about the informant has raised more questions than it

12  has answered. One could readily infer that this informant is

13  simply is combing through the mosques of Baltimore looking for

14  young men who may be susceptible to being involved in this kind

15  of activity.  It is very serious, I think had there been what

16  we suggested, a hearing to determine with greater specificity

17  what happened in this particular case, and what the context of

18  all of these conversations were, the defense would at least be

19  at a position to be able to rebut this.

20          Again, I wish if the Government had conducted this

21  investigation in the way that I submit, it might have done, the

22  entire flavor of what the Court is considering at this point

23  might have been totally different.  At this point, our hands

24  are tied simply because the Government didn't seek to do it

25  that way.

1            THE COURT:  The only other question I had was the

2    three unrecorded conversations that proceeded the October 29,

3    will those be turned over and if so, at what time to the

4    defendants?

5            MS. MANUELIAN:  I am sorry, Your Honor, the three?

6            THE COURT:  There are three unrecorded -- the point

7    that Mr. Balter is making that there were -- October 22, 25 and

8    28 were not recorded.

9            MS. MANUELIAN:  Yes, Your Honor.

10           THE COURT:  Will the substance of those

11   conversations be turned over to the defendants and if so when?

12           MS. MANUELIAN:  The substance of the conversations

13   are essentially what is contained --

14           THE COURT:  In the complaint?

15           MS. MANUELIAN:  -- in the complaint Your Honor,

16   there are a few other notes but other than that, the substance

17   is essentially what is in here and if there are -- at the time

18   that if the CHS is going to be going forward for a trial,

19   obviously the --- will be provided as part of the Jenks Factor.

20           THE COURT:  The Jenks -- so there is -- there are

21   some additional notes but that -- that is it?

22           MS. MANUELIAN:  Correct, Your Honor.

23           THE COURT:  Okay.  All right.  Thank you very much.

24           (Pause.)

25           THE COURT:  All right, will you please stand

 1 │ Mr. Muhammad -- excuse me, Mr. Hussain, Muhammad Hussain would

 2 │ you please stand. You are at issue here today as whether you

 3 │ should be detained pre-trial.  I am finding based on the

 4 │ hearing and what was presented that you should be detained pre-

 5 │ trial.  As indicated by the prosecutor, there is a presumption

 6 │ in this case because of the nature of the charge.

 7 │          Extraordinarily serious charges.  That means you are

 8 │ to be detained unless you can prove -- overcome that

 9 │ presumption and I don't believe you have overcome that

10 │ presumption.  First of all, if you are being detained because

11 │ of danger to the community, there is a clear and convincing

12 │ standard that the Government has to prove.  However, if it is

13 │ just for risk of flight, it is a preponderance of the evidence.

14 │          Preponderance of the evidence means 51/49 percent,

15 │ just a slight chance over 50/50 that you would not return.  I

16 │ think actually in all likely -- both of them have been met but

17 │ particularly clear is the preponderance of the evidence.  Given

18 │ the seriousness of the charge, the erratic and irrational

19 │ behavior and the dangerous behavior that is alleged suggests

20 │ that you might not return if you were released.

21 │          Also the seriousness of the allegations regarding

22 │ what you said and what you prepared to do and did do.  All

23 │ indicate that you would be a danger to the community.  The

24 │ Court looks at several factors in making the decision. One is

25 │ the nature of the charge and I have already talked about the

1    seriousness of those charges.

2            Second, the weight of the evidence.  While Mr.

3    Balter may say a very vigorous argument regarding entrapment

4    and I know he will continue to develop this during his defense

5    of you, that really is an issue for another day.  Primarily

6    because of the strong evidence after late October in terms of

7    going forward and going through with the alleged activity.

8            Second paragraph 35 indicates and I know this is

9    simply a statement under oath, but you indicate, it has been

10   said that you indicated it was your idea and you came to the

11   brother, I think it was with this idea.  The recorded

12   statements or the statements on Facebook and the statements in

13   the notebook that have been referred to today, do not

14   necessarily indicate in and of themselves any criminal activity

15   in holding those beliefs or making those statements, but it

16   does appear -- it is consistent at least with someone who might

17   take those statements, given the depth and the feeling and the

18   belief.

19           So those two both the new statements that are

20   brought in terms of the notebook and the fact that there were

21   statements on Facebook indicating a very deep desire, and even

22   to wage Jihad and the hatred of certain people in the United

23   States.  So other issues really are less important.  The

24   important thing here is the weight of the evidence and the

25   nature of the charges and those -- for those reasons, I am

1   going to detain you pre-trial.

2          We have only a -- we only proceed at this point on

3   criminal complaint which is a statement that another judge of

4   this Court found was probable cause for these charges but we

5   all go next to an indictment. So we need to set a preliminary

6   hearing date with the indictment is not brought in?

7          MS. MANUELIAN:  Yes, Your Honor.  I think the date

8   is December 21, we anticipate that we will have a indictment on

9   or before that date.

10         THE COURT:  So that is the date of the preliminary

11  hearing?  As Mr. Balter will discuss with you, Mr. Hussain, you

12  have the right to ask for a preliminary hearing which means the

13  Government has to prove -- put on more of its evidence in the

14  case.  If you are -- if an indictment is not returned before

15  that time. That is, if a Grand Jury is not presented this

16  evidence and then charges you under that form of an indictment.

17         So we are going to set the preliminary hearing date

18  for December 21, it is rather unusual for us to have a

19  preliminary hearing date but you have the right to have that

20  usually an indictment is returned before that date.  All right.

21         MS. MANUELIAN:  Your Honor, could we just set that

22  in as a matter of formality for the afternoon of the 21st and I

23  will contact Mr. Balter and the Court.

24         THE COURT:  Yes, we will set that in for noon on

25  December 21.  Is there anything further that we need to do

1  today?

2          MS. MANUELIAN:  No, Your Honor.  I may, depending on

3  timing of the Grand Jury, it would be helpful if we could just

4  set it for 2:00 p.m, if there is no objection?  That would make

5  it easier for me to be able to communicate what is going on.

6          THE COURT:  Okay, let's just make sure that we don't

7  have anything scheduled that day yet.  Do you have that in

8  front of you, Ms. Smith?

9          THE CLERK:  Yes, I do, Your Honor.

10          THE COURT:  Is 2:00 free?

11          THE CLERK: Yes, it is.

12          THE COURT:  Okay, all right. Thank you very much. I

13  will remain here for the next case.

14          MR. BALTER:  Thank you, Your Honor.

15          MS. MANUELIAN:  Thank you, Your Honor.

16          (Whereupon, the hearing concluded.)

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

I certify that the foregoing is a correct

transcript from electronic sound recording of the proceedings

in the above-entitled matter.


_____/s/    <u>2/15/2011</u>
Lisa Contreras              Date
Certified Transcriber
Cert. No.**D-474